UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ALEXANDER ANTHONY ARISPE,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | NO.  C13-5425-JCC-JPD<br><br><br><br>REPORT AND RECOMMENDATION |

Plaintiff Alexander Anthony Arispe appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") which denied his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, after a hearing before an administrative law judge ("ALJ"). For the reasons set forth below, the Court recommends that the Commissioner's decision be REVERSED and REMANDED for further administrative proceedings.

I.   FACTS AND PROCEDURAL HISTORY

At the time of the administrative hearing, plaintiff was a thirty-six year old man with the equivalent of a high school education and a forklift certificate. Administrative Record ("AR") at 40, 43, 45. His past work experience includes employment as a janitor, construction worker, carpet installer, warehouse worker, forklift driver, and landscape laborer. AR at 46-

REPORT AND RECOMMENDATION - 1

1  50, 73. Plaintiff was last gainfully employed by the Puyallup School District as a janitor in
2  July 2008. AR at 46.
3        On February 9, 2010, petitioner filed an application for DIB, alleging an onset date of
4  July 24, 2008. AR at 150-53. Plaintiff's date last insured was September 30, 2009. AR at 39.
5  Plaintiff asserts that he is disabled due to right and left shoulder impairments, back injury, left
6  elbow difficulties, carpal tunnel syndrome or a cyst, depression, and anxiety. AR at 40-42, 65-
7  66, 165.
8        The Commissioner denied plaintiff's claim initially and on reconsideration. AR at 84-
9  85. Plaintiff requested a hearing, which took place on October 14, 2011. AR at 36-83. On
10 November 4, 2011, the ALJ issued a decision finding plaintiff not disabled and denied benefits
11 based on a finding that plaintiff could perform a specific job existing in significant numbers in
12 the national economy. AR at 30. Plaintiff's administrative appeal of the ALJ's decision was
13 denied by the Appeals Council, AR at 1-4, making the ALJ's ruling the "final decision" of the
14 Commissioner as that term is defined by 42 U.S.C. § 405(g). On June 4, 2013, plaintiff timely
15 filed the present action challenging the Commissioner's decision. Dkt. 1.
16                           II.       JURISDICTION
17       Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§
18 405(g) and 1383(c)(3).
19                         III.      STANDARD OF REVIEW
20       Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of
21 social security benefits when the ALJ's findings are based on legal error or not supported by
22 substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th
23 Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is
24 such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

REPORT AND RECOMMENDATION - 2

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id*. at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV.   EVALUATING DISABILITY

As the claimant, Mr. Arispe bears the burden of proving that he is disabled within the meaning of the Social Security Act (the "Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled under the Act only if his impairments are

of such severity that he is unable to do his previous work, and cannot, considering his age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof during steps one through four. At step five, the burden shifts to the Commissioner. *Id.* If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps. Step one asks whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).[1] If he is, disability benefits are denied. If he is not, the Commissioner proceeds to step two. At step two, the claimant must establish that he has one or more medically severe impairments, or combination of impairments, that limit his physical or mental ability to do basic work activities. If the claimant does not have such impairments, he is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled. *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's

---

[1] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit. 20 C.F.R. § 404.1572.

REPORT AND RECOMMENDATION - 4

residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the Commissioner evaluates the physical and mental demands of the claimant's past relevant work to determine whether he can still perform that work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant is able to perform his past relevant work, he is not disabled; if the opposite is true, then the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100. If the Commissioner finds the claimant is unable to perform other work, then the claimant is found disabled and benefits may be awarded.

## V. DECISION BELOW

On November 4, 2011, the ALJ issued a decision finding the following:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.

2. The claimant did not engaged in substantial gainful activity during the period from his alleged onset date of July 24, 2008 through the date last insured of September 30, 2009.

3. Through the date last insured, the claimant had the following severe impairment: right shoulder tendinopathy.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could do no pushing or pulling with the upper right extremity. He could do occasional reaching with the upper right extremity, but could never reach overhead. He could never climb ropes, ladders, or scaffolds; he needed to avoid concentrated exposure to hazards, such as machinery and heights. He was limited to standing two and a half hours in an 8-hour day, sitting up to five and a half hours in an 8-hour day, and walking up to five and a half hours in an 8-hour day. He could lift 16 pounds occasionally from floor to waist and 21 pounds occasionally

REPORT AND RECOMMENDATION - 5

from waist to shoulder; he could lift 10 pounds frequently from waist to shoulder; he was unable to lift waist to overhead. He could occasionally bilaterally carry up to 16 pounds; with the left upper extremity, he could carry 15 pounds occasionally and seven and a half pounds frequently; with the light upper extremity, he could carry up to five pounds occasionally and two and a half pounds frequently. He could push or pull 36 pounds occasionally and 18 pounds frequently. He could occasionally squat, crouch, kneel, or reach waist to shoulder. He could seldom (defined as 1-10% of the time) bend and stoop.  He could not crawl.  He could frequently twist, rotate trunk and neck, climb stairs, or reach to waist level.  He could frequently perform fine manipulation, handling, and grasping.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born on XXXXX, 1975 and was 34 years old, which is defined as a younger individual age 18-49, on the last lasted insured.[2]

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 24, 2008, the alleged onset date, through September 30, 2009, the date last insured.

AR at 21-30.

## VI.   ISSUES ON APPEAL

The principal issues on appeal are:

1. Did the ALJ err at step two by finding that plaintiff's alleged depression was not severe prior to his date last insured?

---

[2] The actual date is deleted in accordance with Local Rule CR 5.2, W.D. Washington.

REPORT AND RECOMMENDATION - 6

    2.       Did the ALJ err at step two by finding that plaintiff's left shoulder impairment was not severe prior to his date last insured?

    3.       Did the ALJ err in evaluating the medical opinion evidence?

    4.       Did the ALJ err in evaluating plaintiff's credibility?

    5.       Did the ALJ err by not complying with SSR 96-8p when assessing the plaintiff's RFC?

Dkt. 17 at 2; Dkt. 18 at 2.

## VII.   DISCUSSION

A.    <u>The ALJ Did Not Err at Step Two by Finding that Plaintiff's Alleged Depression Was Not a Medically Determinable and Severe Impairment Prior to His Date Last Insured</u>

At step two, the ALJ found that "[p]rior to the September 30, 2009 [date last insured], the record indicates that the claimant did not have signs of depression." AR at 22. For example, the ALJ noted that Alan Thomas, M.D., Ph.D., a treating physician, found that plaintiff had a "pleasant mental affect" in June 2009, and a "very pleasant mental affect" shortly after plaintiff's date last insured in October 2009 and November 2009. AR at 22 (citing AR at 422, 268-69). The ALJ observed that although several doctors have diagnosed depression since plaintiff's date last insured, these doctors did not opine that plaintiff's depressive symptoms developed earlier. Specifically, the ALJ noted that Walter Teachout, Ph.D., found that plaintiff had signs of being depressed, anxious, despondent, and hopeless in November 2010 and recommended out-patient counseling weekly, but "Dr. Teachout did not indicate that the claimant had demonstrated symptoms of depression prior to examining the claimant." AR at 22 (citing AR at 343). Similarly, although Richard Schneider, M.D., diagnosed major depressive disorder in February 2011, he found that this was "not causally related" to plaintiff's industrial right shoulder injury on October 31, 2007, but instead arose out of anger over his ongoing L&I case, requests to repay money, and a persistent lack of acceptance of his subsequent left shoulder injury as being causally related to his work. AR at 23 (citing 474-79).

REPORT AND RECOMMENDATION - 7

Moreover, the ALJ noted that plaintiff had only described his limitations as stemming from physical pain, rather than mental limitations, in his December 2010 function report.  AR at 22-23 (citing AR at 200-07).  Finally, the ALJ noted that "more recent evaluations," such as the March 2011 joint evaluation of Steven Litsky, M.D., and Sarah Sherrard, Psy.D., "have not found any diagnosis of depression."  AR at 23 (citing AR at 480-86).

Plaintiff argues that the ALJ erred by finding that prior to September 30, 2009, plaintiff did not exhibit signs or symptoms of depression.  Dkt. 17 at 4.  Specifically, plaintiff asserts that his primary care physician Douglas Louie, M.D., first diagnosed plaintiff with depression in April 2007.[3]  Dkt. 19 at 12.  Plaintiff then cites to records from 2010 and 2011 reflecting several other physicians' diagnoses of depression.  Dkt. 17 at 4-5.  For example, Dr. Teachout opined in November 2010 that plaintiff was in "desperate need of psychiatric treatment and medical management ASAP" due to his diagnosis of major depressive disorder with depression, anxiety, worry and despondency.  *Id*. at 5 (citing AR at 343).  Plaintiff argues that there was a colorable claim of a mental impairment in this case, and therefore remand is required because the ALJ "failed to utilize the mandatory psychiatric review technique described in 20 C.F.R. § 404.1520a and 416.920a" and properly include a specific finding as to the degree of plaintiff's limitations in each of the functional areas.  *Id*. at 6 (citing *Keyser v. Astrue*, 648 F.3d 721 (9th Cir. 2011)).

Step two of the sequential evaluation process requires a claimant to prove that he has a severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c), 416.920(c).  An impairment is severe if it significantly limits the plaintiff's ability to perform basic work

---

[3] Plaintiff asserts in his opening brief, without citing to the record, that Dr. Louie diagnosed plaintiff with depression in July 2008.  However, in his reply brief, plaintiff asserts that he "erroneously referred in his opening brief to Dr. Louie having first diagnosed him with depression in 2008 . . . that reference is hereby amended to the correct date of April 2, 2007."  Dkt. 19 at 3.

REPORT AND RECOMMENDATION - 8

activities.[4]  20 C.F.R. § 404.1521(a), 416.921(a).  When an impairment or combination of impairments consist of no more than a slight abnormality that have only a minimal effect on an individual's ability to work, a finding of non-severe is appropriate.  *Smolen*, 80 F.3d at 1290 (internal citations omitted); *see also* SSR 96-3p, at *1.  Hence, step two acts as a "*de minimis* screening device to dispose of groundless claims." *Id.*  Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." *Edlund v. Massanari*, 253 F.3d 1152, 1159-60 (9th Cir. 2001); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments.  20 C.F.R. § 404.1520a.  When a claimant alleges that he or she has a severe mental impairment, these regulations require application of a "special technique" at the second and third steps of the five-step framework, *Schmidt v. Astrue*, 496 F.3d 833, 844 n. 4 (7th Cir. 2007), and at each level of administrative review.  20 C.F.R. § 404.1520a(a).  "Under the special technique, [the ALJ] must first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [she has] a medically determinable mental impairment(s)."  *Id.* § 404.1520a(b)(1).  *See also id*. § 404.1528 ("Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception.").  If the claimant is found to have such an impairment, the reviewing authority must then "rate the degree of functional limitation resulting from the impairment(s) in accordance with

---

[4] Basic work activities include the abilities and aptitudes necessary to do most jobs including walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, understanding, carrying out and remembering simple instructions, and dealing with changes in a routine work setting.  *See* 20 C.F.R. §§ 404.1521(b), 416.921(b).

REPORT AND RECOMMENDATION - 9

paragraph (c)," § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id*. § 404.1520a(c)(3). According to the regulations, if the degree of limitation in each of the first three areas is rated "none or mild," and no episodes of decompensation are identified in the fourth area, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1).

The Ninth Circuit has held that an ALJ's failure to follow the 20 C.F.R. § 404.1520a technique requires reversal if the claimant has a "colorable claim of a mental impairment." *Selassie v. Barnhart*, 203 Fed.Appx. 174, 176 (9th Cir. 2006) (reaffirming its holding in *Gutierrez v. Apfel* as it applies to the current version of 20 C.F.R. § 404.1520a and 416.920a, and holding that "[t]he specific documentation requirements . . . are not mere technicalities that can be ignored as long as the ALJ reaches the same result that it would have if it had followed those requirements."). For example, in *Selassie*, the Ninth Circuit reversed where "neither the ALJ nor the Appeals Council engaged in any of the required analysis with regard to [the claimant]'s diagnosed post traumatic stress disorder ("PTSD")." *Id*. at 176.

Plaintiff's arguments that he had a colorable claim of a mental impairment prior to his date last insured are unpersuasive. With only two exceptions, all the medical opinions cited by the plaintiff were prepared after plaintiff's date last insured, and they all refer to plaintiff's current condition at that time. Moreover, the Court is not persuaded by plaintiff's argument that Dr. Louie actually diagnosed plaintiff with depression in April 2007. Dr. Louie's treatment notes from April 2007 and July 2008 identify shoulder and muscle pain and specifically describe plaintiff's mood as "neutral." AR at 321-22, 324.[5] In April 2007, Dr. Louie also noted

---

[5] Contrary to plaintiff's argument in his reply brief that Dr. Louie checked a box diagnosing issues with "depress (sic), anxiety, anger" in April 2007, July 2008, April 2008,

REPORT AND RECOMMENDATION - 10

plaintiff's self-report that he was experiencing "depression occasional," along with plaintiff's comment that he is experiencing "fatigue," "he wants to stop smoking" a pack of cigarettes per day, and has "used nicotine gum" in the past. AR at 324. Dr. Louie's note that plaintiff reported experiencing depressed feelings on occasion, during one office visit, is not the same as making a clinical diagnosis of depression. Significantly, Dr. Louie's other treatment notes from 2007 and 2008 make no further mention of depression. AR at 320-28.

Similarly, although an August 22, 2008 note from John Lipon, D.O., an orthopedist/orthopedic surgeon who was examining plaintiff's right shoulder, commented that a "system review finds he suffers from sinus problems, heartburn, sleep problems, and depression" based upon "the medical documentation provided and an interview with the examinee," Dr. Lipon's form indicated that this was simply intended as a "historical" observation. AR at 229. It is evident that Dr. Lipon was not attempting to diagnose plaintiff with depression, and Dr. Lipon did not provide any further explanation to support this statement. AR at 229.

Accordingly, the Court finds that the ALJ could reasonably conclude that these vague and isolated references to feelings of depression in the record, which were not tied to any clear medical diagnosis or medical signs, were insufficient to establish the existence of a medically determinable mental impairment prior to plaintiff's date last insured. The ALJ did not err by finding that "the overall record indicates that he did not have signs and symptoms of

---

August 2008, and May 2009, the part of the form plaintiff is referencing indicates only that Dr. Louie properly inquired about the state of plaintiff's mental health during his "review of systems" ("ROS") with the plaintiff. AR at 303. Specifically, the form directs Dr. Louie to "check here if system queried, circle abnormals." AR at 303, 316-17, 322, 324. Dr. Louie consistently checked the box indicating that he had inquired about plaintiff's "psych," but did not circle any abnormalities, such as "depress, anxiety, or anger" on any of the forms. On the contrary, Dr. Louie clearly indicated in the more detailed portion of the forms that plaintiff's mood was "neutral." AR at 303, 316-17, 322, 324.

REPORT AND RECOMMENDATION - 11

depression through the date last insured." AR at 22-23. *See also Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005) (explaining that SSR 96-4p clarified that although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, "the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone.").

The ALJ also did not err by failing to rate the degree of functional limitation for four functional areas pursuant to the "special technique" outlined in 20 C.F.R. § 404.1520a.  As discussed above, under the regulations the ALJ must only "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)" if the ALJ has first concluded that "symptoms, signs and laboratory findings" establish the existence of a medically determinable mental impairment.  Thus, the ALJ did not err at step two because plaintiff did not present a "colorable claim of mental impairment" prior to his date last insured. *See Kayser*, 648 F.3d at 726.

>  B. The ALJ Committed Harmful Error at Step Two by Finding that Plaintiff's Left Shoulder Impairment Was Not Severe Prior to His Date Last Insured

With respect to plaintiff's left shoulder impairment, the ALJ concluded that "the overall record indicates that it was not a severe impairment as of the claimant's date last insured of September 20, 2009." AR at 21.  The ALJ noted plaintiff's self-report that "he began exclusively using his left arm at work after injuring his right arm in October 2007.  However, the record does not demonstrate that the claimant's alleged left arm impairment caused significant limitation of the ability to perform basic work-related functions prior to the date last insured." AR at 21-22.  With respect to the medical evidence, the ALJ concluded that "the longitudinal record of treatment demonstrates full range of motion and strength.  In August 2008, an MRI of the claimant's left shoulder revealed no rotator cuff tear and only mild supraspinatus tendinosis." AR at 22 (citing

REPORT AND RECOMMENDATION - 12

AR at 310). The ALJ then cited to treatment notes from plaintiff's physician Spencer Coray, M.D., documenting full range of motion and 5/5 strength in plaintiff's left shoulder between September 2008 and July 2009. AR at 22 (citing AR at 421, 423, 427, 434).

The ALJ further noted that Dr. Ansari performed an EMG examination of plaintiff's left upper extremity in April 2009, and found "normal [results] except presence of fluid spontaneous activity and reduced recruitment in the left pronator teres muscle. However, it must be pointed out that this patient had difficulty in adequately recruiting the muscle due to inability to fully extend the left elbow." AR at 439. Finally, the ALJ noted plaintiff's self-report to Dr. Lipon in August 2009 that he was able to ride his motorcycle despite his alleged left shoulder impairment. AR at 22 (citing AR at 233).[6] The ALJ concluded that "[w]hile there is evidence of reduced functioning after the claimant's date last insured, the overall record demonstrates that the claimant's alleged left shoulder impairment did not limit his ability to perform basic work-related functions prior to the date last insured. Therefore, the claimant's alleged left shoulder impairment, prior to the date last insured, cannot qualify as a severe impairment." AR at 22 (citing SSR 82-52).

Plaintiff contends that the ALJ erred by finding that his left shoulder impairment was not a severe impairment, and points to evidence that he was diagnosed with bilateral shoulder tendinopathy prior to his date last insured by several of his treating physicians. For example, Dr. Coray of Puget Sound Orthopedics opined in 2010 that plaintiff first developed left shoulder tendinopathy 7 to 10 months after his diagnosis of right shoulder tendinopathy, and that this was caused by overuse of the left upper extremity because of the restrictions to the right side. AR at 421, 423, 424, 432. An MRI of plaintiff's left side in August 2008 showed "mild supraspinatus tendinosis with probable mild bursal surface degenerative fraying and small amount of fluid in the subacromial bursa suggestive of mild bursal inflammation." AR at 310. In August 2008, Dr. Louie diagnosed left shoulder pain and tendinitis, and put plaintiff off work for two weeks on this

---

[6] As discussed further below, this finding by the ALJ is erroneous.

REPORT AND RECOMMENDATION - 13

basis. AR at 307. In April 2009, the EMG of plaintiff's left shoulder by Dr. Ansari showed "quite diffuse and fluid spontaneous activity and reduced recruitment on EMG of the left pronator teres muscle. In the absence of other EMG or NCS abnormalities, it is difficult to explain this abnormality." AR at 437. Plaintiff argues that "the ALJ erred by dismissing or ignoring the diagnoses of a left shoulder tendinopathy . . . despite the diagnoses from multiple providers, without addressing the resulting limitations or considering the combined effect of these impairments with all of the other impairments the plaintiff suffered from" in assessing plaintiff's RFC. Dkt. 17 at 13.

The Commissioner responds that "the ALJ reasonably noted that plaintiff's contemporaneous medical records identified mostly mild or normal findings related to his left shoulder tendinopathy." Dkt. 18 at 8 (citing AR at 21-22). The Commissioner asserts that although plaintiff argues at length that there is ample evidence supporting a diagnosis of left shoulder tendinopathy, these diagnoses are not inconsistent with the ALJ's conclusion that this medically determinable impairment was not severe. Dkt. 18 at 9. Finally, the Commissioner asserts that even if the ALJ erred at step two in analyzing plaintiff's left shoulder impairment, the error was harmless because the ALJ proceeded past step two, and ultimately considered all of plaintiff's impairments in assessing plaintiff's RFC. *Id*. (citing AR at 20, 23-24).

The Court is unconvinced by the Commissioner's argument that even if the ALJ erred by finding plaintiff's left shoulder impairment non-severe, such error was harmless because the ALJ accounted for plaintiff's left shoulder impairment in the RFC assessment. This assertion is not borne out by the record. With respect to plaintiff's right shoulder tendinopathy, which is the only impairment the ALJ found to be severe, the ALJ cited to a December 2007 MRI which revealed "mild tendinopathy," and concluded that "right shoulder tendinopathy is established by the medical evidence and is severe . . . because it causes significant limitation in the claimant's ability to perform basic work activities." AR at 21. In assessing plaintiff's RFC, the ALJ accounted for

REPORT AND RECOMMENDATION - 14

plaintiff's right shoulder impairment by limiting plaintiff to light work, except that "he could do no pushing or pulling with the upper right extremity," only "occasional reaching with the upper right extremity," and could never reach overhead, among other limitations.  AR at 23-24.  By contrast, although plaintiff was also diagnosed with "mild tendinopathy" of his left shoulder based upon an August 2008 MRI and April 2009 EMG, the ALJ's RFC assessment included no limitations regarding plaintiff's ability to push, pull, or reach with his upper left extremity, and only included some moderate limitations regarding the amount of weight plaintiff could lift with his left arm.  AR at 23-24.[7]

In addition, it is not clear plaintiff's left extremity impairment did not result in additional work-related limitations.  As discussed above, an August 2008 MRI and April 2009 EMG caused several of plaintiff's treating physicians to diagnose him with bilateral shoulder tendinopathy before his date last insured.[8]  Plaintiff's primary care physician, Dr. Louie, diagnosed left shoulder pain and tendinitis in August 2008, referred plaintiff to orthopedics for his left shoulder, and put plaintiff off work for two weeks on this basis.  AR at 307.  Orthopedist Dr. Thomas, who primarily treated plaintiff for his right shoulder impairment but also provided some treatment for his left shoulder, opined in February 2009 that as a result of plaintiff's "brachial plexus neuritis with bilateral shoulder tendinopathy," plaintiff "is not able to work as he cannot use his arms functionally."  AR at 427.  The treatment notes of plaintiff's orthopedist Dr. Coray, who primarily treated plaintiff's left shoulder impairment, reflect his opinion that plaintiff first developed left shoulder tendinopathy 7 to 10 months after his diagnosis of right shoulder tendinopathy, and that

---

[7] The ALJ's RFC assessment included specific limitations regarding the amount of weight plaintiff could lift with each arm, and she found that plaintiff could lift more weight with his left extremity than his right extremity.  AR at 24.

[8] As mentioned above, an MRI of plaintiff's left side in August 2008 showed "mild supraspinatus tendinosis with probable mild bursal surface degenerative fraying and small amount of fluid in the subacromial bursa suggestive of mild bursal inflammation."  AR at 310. In April 2009, the EMG of plaintiff's left shoulder by Dr. Ansari showed "quite diffuse and fluid spontaneous activity and reduced recruitment on EMG of the left pronator teres muscle." AR at 437.

REPORT AND RECOMMENDATION - 15

this was caused by overuse of the left upper extremity because of the restrictions to the right side. AR at 421-24, 432.  On April 14, 2009, Dr. Coray specifically examined plaintiff due to his left shoulder complaints and opined that "I do think there is a real component of pain here and, although it is difficult to objectively quantify, there is definitely some pathology present that is generating pain in both the upper extremities . . . As far as doing work with no restrictions, I do think that would be inappropriate.  I do think, based on my multiple exams, that he does need restrictions as far as activities, and he needs to remain in the category of light duties, with limited use of the upper extremities."  AR at 423.  Thus, the ALJ's conclusion that plaintiff's left extremity impairment did not significantly limit his ability to perform basic work activities, which the regulations define as including the ability to lift, push, pull reach, and carry, appears unreasonable.  20 C.F.R. § 404.1521(a)-(b), 416.921(a)-(b).

Moreover, the ALJ's assertion that "in August 2009 (sic), the claimant reported that he was able to ride his motorcycle despite his alleged left shoulder impairment" misstates Dr. Lipon's August 22, 2008 report.  AR at 22.  Specifically, Dr. Lipon stated that "he says riding this motorcycle does not aggravate his *right* shoulder condition."  AR at 233 (emphasis added).  However, Dr. Lipon noted that "[t]oday Mr. Arispe says he has not ridden his motorcycle for the last two months because of his *left* shoulder condition."  AR at 233 (emphasis added).

Finally, the Court once again rejects the Commissioner's argument that because the ALJ found that plaintiff had at least one severe impairment at step two, and did not "screen out" plaintiff's application at this stage of the sequential evaluation process, any error by the ALJ at step two was harmless.  The ALJ's failure to identify a significant impairment at step two likely narrowed the scope of the ALJ's subsequent analysis, appears to have led to diminished consideration of plaintiff's testimony as well as the opinions of his treating specialists, and affected the ALJ's ability to determine whether plaintiff is disabled.  This is

REPORT AND RECOMMENDATION - 16

particularly concerning in a case such as this one, where the ALJ was able to identify only one occupation in the local and national economy that plaintiff would be able to perform given the ALJ's RFC.  Additional limitations resulting from a severe left arm impairment, which would further restrict plaintiff's RFC, would almost certainly alter the outcome of the ALJ's decision.  The ALJ's errors at step two were not harmless.

Because the ALJ's errors at step two likely affected the remainder of the ALJ's analysis, the Court will remand for a *de novo* hearing.  On remand, the ALJ shall re-evaluate plaintiff's medically determinable impairments at step two, and shall reassess plaintiff's RFC.  Finally, it is unnecessary to consider plaintiff's remaining assignments of error.

## VIII.   CONCLUSION

For the foregoing reasons, the Court recommends that this case be REVERSED and REMANDED to the Commissioner for further proceedings not inconsistent with the Court's instructions.  A proposed order accompanies this Report and Recommendation.

DATED this 28th day of January, 2014.

JAMES P. DONOHUE
United States Magistrate Judge